UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JAMES PETERS, <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, <br> Commissioner of the Social Security Administration, <br><br> Defendant. | CAUSE NO. 3:18-CV-817 DRL |

ORDER AND OPINION

Plaintiff James Peters seeks judicial review of the Social Security Administration's decision denying his application for disability and disability insurance benefits under Title II of the Social Security Act. *See* 42 U.S.C. § 423(a). Mr. Peters requests remand of his claim for further consideration. Having reviewed the underlying record and the parties' arguments, the court AFFIRMS the ALJ's judgment denying Mr. Peters social security benefits.

BACKGROUND

On March 15, 2015, Mr. Peters filed an application for Social Security-Disability Insurance Benefits, asserting that he was disabled and had been disabled since January 30, 2014. ECF 12 at 14. On September 21, 2017, a hearing was held before the ALJ. *Id.* On December 22, 2017, the ALJ entered a decision denying Mr. Peters benefits. *Id.* at 26. On February 19, 2018, Mr. Peters challenged the ALJ's decision by timely filing a Request for Review of Hearing Decision/Order with the Appeals Council. *Id.* at 8. The Appeals Council denied review of the ALJ's decision on August 7, 2018. *Id.* at 5. Because the Appeals Council denied review of the ALJ's unfavorable decision, that ALJ decision is the final decision of the agency. *See* 20 C.F.R. 404.981.

Thereafter, Mr. Peters timely filed his complaint to this court. ECF 1. Mr. Peters also filed an opening brief. ECF 15. The Social Security Commission timely filed a response. ECF 16. Mr. Peters did not exercise his right to reply. The issues are fully ripe for decision.

STANDARD

The court has authority to review the Council's decision under 42 U.S.C. § 405(g); however, review is bound by a strict standard. Because the Council denied review, the court evaluates the ALJ's decision as the Commissioner's final word. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). The ALJ's findings, if supported by substantial evidence, are conclusive and nonreviewable. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is that evidence that "a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and may well be less than a preponderance of the evidence, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Richardson*, 402 U.S. at 401). If the ALJ has relied on reasonable evidence and built an "accurate and logical bridge between the evidence and her conclusion," the decision must stand. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Even if "reasonable minds could differ" concerning the ALJ's decision, the court must affirm if the decision has adequate support. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

DISCUSSION

When considering a claimant's eligibility for disability benefits, an ALJ must apply the standard five-step analysis: (1) is the claimant currently employed; (2) is the claimant's impairment or combination of impairments severe; (3) do her impairments meet or exceed any of the specific impairments listed that the Secretary acknowledges to be so severe as to be conclusively disabling; (4) if the impairment has not been listed by the Secretary as conclusively disabling, given the claimant's residual function capacity, is the claimant unable to perform her former occupation; (5) is the claimant unable to perform any other work in the national economy given her age, education and work

2

experience. *See Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof until step five, where the burden shifts to the Commissioner to prove that the claimant can perform other work in the economy. *See id.*

Here, the ALJ found that Mr. Peters satisfied step one by not being currently employed in substantial gainful activity. ECF 12 at 16. The ALJ then found that Mr. Peters satisfied step two by finding that he had several severe impairments, including degenerative disc disease, knee osteoarthritis, degenerative changes in right shoulder, history of ankle fracture with chronic injury to ligaments, traumatic arthritis to the ankle, peripheral neuropathy of the lower extremities, history of ingrown toenail, diabetes, obesity, and headaches. *Id.* The ALJ then found that Mr. Peters' impairments did not meet or exceed any of the specific impairments listed that are so severe as to be conclusively disabling. *Id.* at 13. The ALJ then proceeded to formulate the following Residual Functional Capacity (RFC):

> [C]laimant can lift and carry and push/pull 20 pounds occasionally, and 10 pounds frequently, and can stand and/or walk for six hours of an eight-hour workday, and sit for six hours of an eight-hour workday. The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant must avoid reaching overhead with the dominant arm, and can perform frequent reaching in all other directions with the dominant arm. The claimant must avoid concentrated exposure to slippery and uneven surfaces, and must avoid all exposure to hazards such as dangerous moving machinery, and unprotected heights. The claimant must avoid operating motorized vehicles as part of work duties, and must avoid concentrated exposure to sunlight or bright task lighting. The claimant can understand, remember, and carry out instructions to perform simple tasks, and can exercise judgment required to perform simple tasks. The claimant is limited to routine and repetitive tasks—essentially the same tasks in the same place every day, with no fast paced or piece rate work, with end of day goals only. The claimant must avoid work requiring frequent tracking of moving objects, such as inspecting an item moving by on a conveyor belt.

*Id.* at 19. At step four, the ALJ determined, based on his RFC findings, that Mr. Peters was unable to perform past work. *Id.* at 24. At step five, however, the ALJ found that Mr. Peters could perform other work that exists in significant numbers in the national economy as a marker, cleaner-housekeeper, and folding machine operator. *Id.* at 25. Because of his determination at step five, the ALJ denied Mr. Peters benefits.

Mr. Peters asserts the ALJ erred in four ways in his decision. Mr. Peters argues that: (1) the ALJ failed to adequately account for his moderate limitations in concentration, persistence, and pace in the RFC; (2) the ALJ failed to adequately account for his moderate limitations in understanding, remembering, or applying information in the RFC; (3) the ALJ failed to include adequate limitations regarding handling, fingering, or feeling in the RFC; and (4) the ALJ erred in failing to identify and reconcile apparent conflicts between the testimony of the vocational expert (VE) and the *Dictionary of Occupational Titles* (DOT).

Because the first three objections center around the RFC, the court notes the relevant functions of the RFC. The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The determination of an RFC is a legal decision rather than a medical one. *See Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). That landscape painted, the court turns now to decide the arguments on appeal.

A. Mental Limitations

Two objections deal with the RFC's mental limitation findings. The RFC finding here found that Mr. Peters had the following mental limitations:

> The claimant can understand, remember, and carry out instructions to perform simple tasks, and can exercise judgment required to perform simple tasks. The claimant is limited to routine and repetitive tasks—essentially the same tasks in the same place every day, with no fast paced or piece rate work, with end of day goals only. The claimant must avoid work requiring frequent tracking of moving objects, such as inspecting an item moving by on a conveyor belt.

ECF 12 at 19. This RFC finding was recited in the ALJ's hypothetical to the vocational expert. *Id.* at 59. Mr. Peters argues in his first two objections that the RFC finding does not account for the ALJ's determination at step three of the sequential evaluation process that Mr. Peters had moderate

4

limitations in (1) concentration, persistence, or pace and (2) understanding, remembering, or applying information.

1.   *Concentration, Persistence, and Pace*

Mr. Peters' first objection to the RFC is that it fails to consider his mental limitations in concentration, persistence, and pace. An ALJ must orient a vocational expert "to the totality of a claimant's limitations," including "deficiencies of concentration, persistence and pace." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Ordinarily, "the most effective way to ensure that the [expert] is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *Id.* An ALJ need not use "specific terminology," though. *Id.*

There are two alternative methods for finding that the RFC and expert questioning accounts for a plaintiff's limitations in concentration, persistence, and pace when the RFC lacks any explicit references to those specific terms. First, this circuit has "assumed a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations." *Id.* Second, this circuit has also let "stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id.*

The ALJ posed in his questions to the VE an individual who could only do "routine and repetitive" work, "performing essentially the same tasks in the same place every day," limiting the individual to "end of day goals only," and precluding both "fast paced or piece rate work" as well as "work that requires frequent tracking of moving objects." ECF 12 at 59. The ALJ's hypothetical did not explicitly account for Mr. Peters' moderate limitations in concentration, persistence, and pace, *see Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018), so one of the two alternative methods to satisfy the concentration limitations must apply here.

When an ALJ limits the VE by the nature of his questioning "from considering physical, psychological, or cognitive limitations that he may have absorbed either through reviewing the evidence in the record or by listening to the hearing testimony," the first alternative method does not apply. *See Young*, 362 F.3d at 1003. Here, although the VE did indicate that he was familiar with the vocational record and had listened to the claimant's testimony, the ALJ included such limits in his hypotheticals by asking the VE to only consider the limitations in the hypothetical. *See* ECF 12 at 58-59. Because the first alternative method does not apply as a result of the non-record limitations, the ALJ's "alternative phrasing" must have sufficiently limited the hypothetical to someone of Mr. Peters mental ability. *See O'Connor-Spinner*, 627 F.3d at 619.

This circuit has held that a hypothetical stating that an "individual can understand, remember, and carry out simple work instructions," can "exercise simple work place judgments," is "limited to routine work," and can have "no more than occasional changes in the work setting" is insufficient in certain circumstances to account for moderate limitations in concentration, persistence, and pace. *See Moreno*, 882 F.3d at 730. This circuit, in certain circumstances, also has "rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014). But those cases have not been interpreted as a blanket rule that limitations to simple, routine, and repetitive tasks always fail to accommodate moderate difficulties in concentration, persistence, and pace. *See, e.g, William F. v. Saul*, 2019 WL 4727722, at *4 (N.D. Ind. Sept. 26, 2019) (DeGuilio, J.) (finding that an ALJ incorporated moderate limitations in concentration, persistence, and pace by limiting the claimant to "simple, routine, or repetitive tasks" and "to simple work-related decisions"). Just recently, this circuit found that an ALJ's RFC determination limiting the hypothetical individual to simple, routine, and repetitive tasks with interaction limitations addressed the claimant's moderate difficulties in concentration, persistence, and

6

pace because the ALJ tied the record evidence to the limitation in the RFC finding. *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019). Thus, this court must inquire as to whether the ALJ's RFC limitations are accurately tied to the record evidence and each RFC must be assessed on a case-by-case basis.

Notably, in challenging the ALJ's assessment of his ability to concentrate, persist, or maintain pace, Mr. Peters does not refer at all to his individualized medical history or to the medical evidence of record. Neither does Mr. Peters identify with any specificity how the RFC should have been changed or what additional functional limitations are supported by the record. Mr. Peters does not even argue that he is incapable of performing the assessed RFC or hypothetical questions posed to the vocational expert or that the RFC is unsupported by the record.

By contrast, in formulating the RFC, the ALJ relied upon the record in its entirety and discussed Mr. Peters' mental limitations—satisfying this court that the ALJ tied the record evidence into his RFC determination. *See id.* The ALJ discussed Mr. Peters' examination by his neurologist, Richard Strawsburg, M.D., which was conducted in November 2015. ECF 12 at 21, 377. This examination revealed that Mr. Peters was alert and fully oriented, that he displayed no impairment of recent or remote memory, and that he displayed a normal attention span as well as an ability to concentrate. *Id.* An MRI of Mr. Peters' brain also revealed only very mild chronic white matter ischemic changes. *Id.* at 21, 393.

In December 2015, Mr. Peters had a consultative examination with R. Jao, M.D. *Id.* at 21, 23, 358-62. Mr. Peters did not report any changes in mood or memory loss, and Dr. Jao noted that Mr. Peters' memory for recent and remote medical events was preserved and that his intellectual functioning was grossly normal. *Id.* at 360.

In January 2016, Dr. Strawsburg noted that Mr. Peters was fully oriented, with a normal mood and affect. *Id.* at 22, 371. Mr. Peters displayed no impairment of recent normal memory. *Id.* Mr. Peters

had a normal attention span and a normal ability to concentrate. *Id.* Dr. Strawburg referred Mr. Peters for a neuropsychological evaluation due to a diagnosis of memory impairment of a gradual onset. *Id.* at 22, 372. Dr. Strawsburg also sent a letter to Mr. Peters' primary care physician's office noting that Mr. Peters had some slightly halting speech, problems with memory, and a mildly unsteady gait. *Id.* at 22, 392.

In March 2016, Mr. Peters attended a neuropsychological exam conducted by Gary Elliott, Ph.D. *Id.* at 18, 22, 431. Mr. Peters reported to Dr. Elliott that he had memory difficulties, but his attention/concentration were "generally 'okay.'" *Id.* Mr. Peters denied getting lost while driving or having problems finding words. *Id.* A mental status examination revealed that Mr. Peters was alert, oriented, pleasant, and cooperative. *Id.* Mr. Peters' thought processes were grossly intact, though he did show mild cognitive slowing, with a slightly extended response latency at the conversational level. *Id.* On testing, Mr. Peters achieved borderline scores on tasks related to auditory attention span and nonverbal abstraction, and he performed well on measures of temporal orientation, visual spatial construction/organization, and global language functioning. *Id.* at 18, 22, 432, 435. Dr. Elliot noted that Mr. Peters scored satisfactorily on a RCFT subtest, which is a more complex measure of spatial organization/planning. *Id.* at 17, 22, 433. As Dr. Elliot noted, that result was meaningful because patients with early dementia, especially Alzheimer's, usually generate very poor/fragmented results on that subtest. *Id.* Overall, Dr. Elliot's findings were indicative of a globally moderate neurocognitive impairment. *Id.* at 22, 435.

Mr. Peters followed-up with Dr. Strawsburg in June 2016 and reported to him that his memory was better with rest and worse with fatigue. *Id.* at 22, 441. An examination revealed that Mr. Peters was alert and fully oriented, with no impairment of recent or remote memory, and he displayed a normal attention span and normal ability to concentrate. *Id.* at 23, 443. Dr. Strawsburg found that Mr.

8

Peters' cognitive functioning was normal and his neurological examination was at baseline. *Id.* at 23, 423, 443.

The state agency psychological consultant who reviewed Mr. Peters' records in January 2016 opined that Mr. Peters' mental impairment did not impair day-to-day activities. *Id.* at 24, 73-74. Yet the ALJ found that the opinion was not generally consistent with the medical evidence of record. *Id.* at 24. As such, he gave the opinion little weight, and gave Mr. Peters a more limited analysis in his RFC determination. *Id.*

The limitations imposed by the ALJ in the RFC and his hypothetical to the vocational expert take into consideration all of these previous pieces of evidence. The ALJ did find that the Mr. Peters had moderate limitations in concentration, persistence, and pace, in contrast to the findings of the state agency psychological consultant's finding. But these limitations were accounted for in the RFC finding in multiple instances, where the ALJ limited claimant to understanding instructions for simple tasks, exercising judgment for simple tasks, limitations to routine and repetitive tasks that are slow paced and with only daily goals, and avoid work requiring frequent tracking of moving objects. These limitations address Mr. Peters' restrictions in concentration, persistence, and pace, and are supported by substantial evidence as required by *Jozefyk*, 923 F.3d at 497-98.

2. *Limitations in Understanding, Remembering, or Applying Information*

Mr. Peters has also challenged the ALJ's assessment of his ability to understand, remember, or apply information. The ALJ's RFC limited claimant able to only "understand, remember, and carry out instructions to perform simple tasks, and [Mr. Peters] can exercise judgment required to perform simple tasks." Mr. Peters contends that the RFC finding should have included the following additional limitations: (1) he needs to have reminders to perform tasks; and (2) he needs to be able to step away from a task if he could not remember it.

Weighing conflicting evidence from medical experts, which is the case here, is what the ALJ is required to do. *Young*, 362 F.3d at 1001. When there are conflicting opinions from medical experts, an ALJ must decide, based on several considerations, which doctor to believe. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). Moreover, the district court "may not re-weigh the evidence." *Young*, 362 F.3d at 1001. All that is necessary is that an ALJ build an "accurate and logical bridge from the evidence to his conclusion" sufficient to afford this court "meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Even though a plaintiff, or even this court, may disagree with an ALJ's decision not to include a specific limitation, that does not mean the ALJ failed to account for a plaintiff's limitations nor does it make the ALJ's RFC determination unsupported by substantial evidence. *See Young*, 362 F.3d at 1001; *see also Stephens v. Colvin*, 2016 WL 5389292, at *5 (N.D. Ind. Sept. 27, 2016) (Van Bokkelen, J.).

Mr. Peters points to various sources of evidence for his argument that the RFC did not adequately account for his moderate limitations in understanding, remembering, or applying information. For example, Dr. Elliott noted during a comprehensive neuropsychological evaluation that Mr. Peters was alert and attentive, albeit phlegmatic, with modest cognitive slowing and a penchant to at times appear befuddled or confused. ECF 12 at 435, 439. He further observed that the Mr. Peters tended to be somewhat concrete and literal in his problem-solving approach. *Id.* During the evaluation, Mr. Peters reported that his day-to-day recall of events was variable, with the same thing being true for his ability to remember recent conversations. *Id.* Other areas appeared normal, though: he had okay attention/concentration ability, he was generally independent with his medication schedule by utilizing a pill divider, and denied getting lost while driving. *Id.* He was also able to do word-finding problems. *Id.* at 431. Overall, Dr. Elliott concluded that Mr. Peters demonstrated globally moderate neurocognitive impairment, implicating significant deficits in terms of immediate

and delayed memory, attention, psychomotor and cognitive speed, verbal fluency and mental "tracking." *Id.* at 435.

Additionally, Dr. Strawsburg noted on mental status examinations that Mr. Peters could not recall any objects after five minutes, *id.* at 369, and Dr. Arif noted that Mr. Peters lost two points in recall on mini mental status examination, *id.* at 455.

Mr. Peters also testified that he had problems with remembering names and dates and how to fix things at his prior job. *Id.* at 46. He would have to walk away from a task and come back the next day. *Id.* He also testified that he did no know the names of his medicines and that his wife takes care of his medicines and puts them in a pill box. *Id.* He testified that he would not be able to remember to take his medicines without his wife's help. *Id.* He testified that his ability to pay attention is not too good. *Id.*

Other evidence, however, supports the ALJ's lack of additional limitations. For one thing, Mr. Peters' own testimony is undermined by his own admission that he could pay attention and that his ability to follow instructions was "ok to fair." *Id.* at 18, 216, 241. The ALJ did consider the objective medical evidence from the sources that Mr. Peters cites on appeal but found that the evidence weighed against any additional limitations. *Id.* at 20-24.

Examples of evidence in the ALJ's determination's favor consist of Mr. Peters' neurologist's (Richard Strawsburg, M.D.) examination that revealed that Mr. Peters displayed no impairment of recent or remote memory in November 2015. *Id.* at 21, 377. In December 2015, when presented to R. Jao, M.D. for a consultative examination, Mr. Peters did not report any changes in mood or memory loss. *Id.* at 21, 23, 360. Dr. Jao also noted that Mr. Peters' memory for recent and remote medical events was preserved, and his intellectual functioning was grossly normal. *Id.* at 360. In January 2016, Dr. Strawsburg noted that Mr. Peters displayed no impairment of recent normal memory. A follow-up examination with Dr. Strawsburg in June 2016 revealed that Mr. Peters had no impairment of

11

recent or remote memory. *Id.* at 23, 423, 443. Dr. Strawsburg likewise found that Mr. Peters' cognitive functioning was normal and his neurological examination was at baseline. *Id.*

There was evidence that was even less restrictive than the limitations that the ALJ imposed. Indeed, the state agency psychological consultant who reviewed Mr. Peters' records in January 2016 opined that Mr. Peters' mental impairment did not impair day-to-day activities. *Id.* at 24, 73-74. Notably, the ALJ gave this opinion little weight after finding that the opinion was not generally consistent with the medical evidence of record. *Id.* at 24.

The record clearly demonstrates conflicting evidence of Mr. Peters' mental limitations in understanding, remembering, and applying information. This court, however, only reviews the ALJ's opinion for substantial evidence. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). If a decision is supported by substantial evidence, this court must not substitute its own judgment for the ALJ's judgment, even if it disagrees with the ALJ's determination. *See id.* Given the conflicting evidence and the ALJ's consideration of all sources of evidence in coming to his RFC determination, the court finds that the ALJ properly built a "logical bridge" connecting the evidence to his conclusion sufficient for meaningful judicial review and that his determination was supported by substantial evidence.

    B.    Limitations regarding Handling, Fingering, or Feeling

Mr. Peters also objects to the RFC determination on the ground that the ALJ did not include a limitation in the RFC assessment for handling, fingering, and feeling, and that the ALJ did not address whether this condition was severe or non-severe or even whether it was a medically determinable impairment. Here, the ALJ did include other manipulative limitations: "[t]he claimant must avoid reaching overhead with the dominant arm, and can perform frequent reaching in all other directions with the dominant arm." ECF 12 at 19. Thus, the ALJ did limit Mr. Peters' ability to reach, although the ALJ did not limit Mr. Peters' abilities in handling, fingering, and feeling. *See id.*

There is some evidence to back up a limitation in this area. Mr. Peters testified that he had difficulty grasping cups and other objects due to pain and a burning sensation in his hands. *Id.* at 51-52. Dr. Holm also noted that in seven visits to his office, a review of systems found that Mr. Peters had distal tingling and numbness of the hands and feet. *See id.* at 327-48. And, while the ALJ did note that an EMG of the upper extremities was normal, the consultative exam showed abnormal grip strength bilaterally. *Id.* at 360.

As previously stated, a claimant's RFC "describes the maximum she can do in a work setting despite her mental and physical limitations." *Thomas*, 745 F.3d at 807. "When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). "A failure to fully consider the impact of non-severe impairments requires reversal." *Id.* If the record does not show that the ALJ considered all of a claimant's impairments "in concert," a court "cannot say that the ALJ built the required 'accurate and logical bridge' between the evidence and her conclusion." *Thomas*, 745 F.3d at 807 (citation omitted). "The ALJ 'may not select and discuss only that evidence that favors [her] ultimate conclusion,' but 'must confront the evidence that does not support [her] conclusion and explain why it was rejected.'" *Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018) (citations omitted).

To begin, the court notes that Mr. Peters relies, in part, on his own subjective testimony regarding his pain in this objection. But this circuit has held that "medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th Cir. 2004). Thus, the court will need other evidence showing that Mr. Peters had an impairment.

In coming to her conclusion that no further limitations were required in the RFC, the ALJ relied on the evidence cited by Mr. Peters as well as contrary evidence that suggested that Mr. Peters'

allegations were not consistent with the evidence. ECF 12 at 23. For example, the ALJ discussed Dr. Jao's December 2015 consultative examination. *Id.* at 21, 358-62. Dr. Jao found that Mr. Peters had pain and tenderness in his right shoulder, with decreased range of motion. *Id.* An x-ray of Mr. Peters' right shoulder revealed tendinitis of the right humeral head, but it was otherwise grossly normal. *Id.* at 21, 364. Mr. Peters had 5/5 (normal) strength in all major upper muscle groups. *Id.* at 21, 360. Mr. Peters had normal sensation to light touch and pinprick, and a neurological examination was normal. *Id.* Mr. Peters displayed abnormal grip strength at 4/5 bilaterally, but he demonstrated good fine finger manipulative abilities, and his coordination was normal. *Id.*

Moreover, in January 2016, Dr. Strawsburg found that Mr. Peters had normal strength, sensory, and reflex examinations. *Id.* at 22, 371.

A May 2017 EMG of the upper extremities was normal. *Id.* at 23, 457-58. When reviewing the EMG the following month, Dr. Holm noted that Mr. Peters' "[u]pper extremities are fine." *Id.* at 410. He diagnosed no manipulative limitations for Mr. Peters. *Id.* at 411. In June 2017, neurologist Hassan Arif, M.D., noted that Mr. Peters' sensation in his upper extremities was normal. *Id.* at 23, 451. In fact, Mr. Peters appeared to have full muscle strength in his bilateral upper extremities. *Id.* at 451.

The ALJ also considered the November 2015 opinion of R. Scott Carlson, O.D., who indicated that he did "not feel [Mr. Peters] has any limitations to do work-related physical activities such as sitting, standing, walking, lifting, carrying, *handling objects*, hearing, speaking, or traveling." *Id.* at 21, 349 (emphasis added).

Additionally, the ALJ considered the opinions of the state agency medical consultants who reviewed Mr. Peters' records at the initial application stage and on reconsideration but determined that Mr. Peters had no manipulative limitations. *Id.* at 24, 75-77, 87-90. The ALJ gave some weight to these opinions, but after considering the record in its entirety, assessed a manipulative limitation

related to reaching. *Id.* at 24. The ALJ found that the objective evidence did not warrant additional functional limitations.

Mr. Peters also argues that the ALJ failed to address whether the condition assessed by Dr. Holm—that he had a consultative examination that showed abnormal grip strength bilaterally—was severe or non-severe or even whether it was a medically determinable impairment. *See id.* at 16-17. At step two, the ALJ evaluated Mr. Peters' impairments and found several the impairments to be severe under the regulations. *Id.* Thus, the ALJ found in Mr. Peters' favor at step two and then proceeded to consider all his alleged impairments, including those deemed "non-severe" at subsequent steps of the sequential evaluation. *See id.* at 16-24.

At step two of the analysis, an ALJ is required only to determine if the plaintiff has a severe medically determinable physical or mental impairment, or a combination of impairments that is severe and meets the duration requirement. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Should the ALJ find one of those prongs satisfied, the analysis then proceeds further. *See id.* This circuit has stated that "[d]eciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (emphasis in original). Any error at step two analysis is harmless so long as one condition is found to be severe or if the combination of impairments is found to be severe. *See id.* Here, the ALJ found at step two of the analysis that Mr. Peters had several impairments—both singly and in combination—to be severe under the regulations. ECF 12 at 16-17. Therefore, even if the ALJ made a mistake about the severity of one of Mr. Peters' impairments as Mr. Peters claims, any error at the step two analysis is rendered harmless because the analysis proceeded to the next step.

Because the court finds that substantial evidence supports the ALJ's decision making at step two and in his RFC determination, the court overrules this objection.

C.  Conflicts between the VE and DOT

An ALJ has an affirmative responsibility to ask whether a vocational expert's evidence "conflicts with information provided in the DOT" before relying on that evidence to support a determination of nondisability. *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008). The first step of this analysis is to simply ask the vocational expert if his testimony is consistent with the DOT. *See id.* at 463. Second, even if evidence from a vocational expert "appears to conflict with the DOT," the ALJ must obtain "a reasonable explanation for the apparent conflict." *Id.* The claimant is "not required to raise the issue [about potential conflicts] at the hearing, because the Ruling places the burden on making the necessary inquiry on the ALJ." *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).

The court first notes that the ALJ satisfied the initial step of the conflict analysis, *see Overman*, 546 F.3d at 463, by asking the vocational expert the following hypothetical question that included inquiry into whether the hypothetical conflicted with the DOT: "Hypothetical #2, please assume the same limitations in hypothetical #1 except the individual is able to make no more than occasional forceful grasping with the hands. Does that eliminate or reduce any of the identified jobs?" The vocationalist replied in the negative, stating: "I don't believe it would eliminate the positions." ECF 12 at 60. Mr. Peters argues that the expert was incorrect in this statement because the Selected Characteristics of Occupations (SCO) states that the jobs of folding-machine operator, cleaner-housekeeper, and marker all require frequent handling, not occasional. As will soon become clear, though, the court need not assess whether the expert made an error.

For an ALJ's error to warrant remand, there must be a showing by the plaintiff that the error prejudiced his case. *Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009). By contrast, harmless errors do not warrant remand. *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010). An error is harmless if the court "can predict with great confidence that the result on remand would be the same." *Schomas*, 732 F.3d at 707. Here, the RFC determination ultimately decided upon by the ALJ did not include the

16

handling limitations posed in hypothetical #2. ECF 12 at 19. Therefore, any error by the expert and ALJ in assessing whether the hypothetical facts conflicted with the DOT was rendered harmless because the result on remand would be the same. *See Parker*, 597 F.3d at 924.

CONCLUSION

The court is satisfied that the ALJ built a logical bridge from his evidence to his conclusion that Mr. Peters was not entitled to social security benefits. The conclusion was supported by substantial evidence. The court therefore DENIES Mr. Peters' request for remand and AFFIRMS the Commissioner's decision.

SO ORDERED.

December 11, 2019              *s/ Damon R. Leichty*
                               Judge, United States District Court